Let's take up our next case, People v. David Marsh. Argue for the appellate. May it please the Court, Counselor, my name is Lawrence O'Neill and I represent David Marsh in this appeal. This is a direct appeal following a jury trial where Mr. Marsh was convicted of two counts of burglary for the burglaries of two businesses in Cargondale. In argument one, I ask this Court to reverse Mr. Marsh's convictions and remand for a new trial because the trial court failed to comply with Supreme Court Rule 431B during Boyd year. Supreme Court Rule 431B requires a trial judge to ask potential jurors whether they understand and accept four fundamental principles of criminal law. They are that the defendant is presumed innocent, that before a defendant can be convicted the state is proven guilty beyond reasonable doubt, that the defendant is not required to offer any evidence on his or her behalf, and that the defendant's failure to testify cannot be used against him. The purpose of this rule is to ensure that any potential juror who is prejudiced against these bedrock principles of criminal law is unqualified to sit on the jury. And the failure of the trial court to comply with Rule 431B denies the defendant his right to a fair and impartial jury. In the incident case, as the state concedes, the trial court did not comply with Rule 431B. Regarding the first principle, the defendant's presumption of innocence, the Court asked the jurors, do you understand that the accused is presumed innocent? And will you be able to give the accused the presumption of innocence? However, the Court did not ask the jurors whether they understood or accepted this principle. The Court's error in the second principle, that the state was required to prove the defendant guilty beyond reasonable doubt, was even more apparent. The Court asked the jurors whether they would require the state to prove the allegations beyond reasonable doubt. This general question does not comport with Rule 431B, which requires the Court to inquire as to understanding and acceptance of the principle. Third, with respect to the principle that the defendant is not required to offer any evidence, the Court only asked if they understand this principle. The Court did not ask whether they, the jurors, accepted this principle as required by 431B in quick cases that have interpreted it, such as Zierin, Thompson, Wilmington, and this Court's decision in People v. Mueller. The fourth principle, the defendant's failure to testify cannot be held against them, the Court did not ask any of the potential jurors if they accepted this principle. Now, this is very important for this case because Mr. Marsh did not testify. So it was very crucial for the judge to determine whether any of the jurors would not accept this principle of the defendant's right to not testify and that that evidence cannot be held against them. Thus, by not asking the prospective jurors whether they understood and accepted these fundamental principles of law, the Court failed to comply with 431B. Again, it's noted the state actually conceded that the state did not comply with these principles. However, the trial court did not object to the Court's noncompliance with Rule 431B. Nevertheless, a violation of Rule 431B may be reviewed under the plain error doctrine when the evidence is so closely balanced that the error threatens to tip the scales of justice against the defendant. Thus, the question here is whether the error amounts to plain error under the closely balanced prong of the plain error doctrine. Now, it's important to note that whether the evidence is closely balanced is a separate question from a reasonable doubt argument, a sufficiency in the evidence argument. And the facts in this case were closely balanced for purposes of plain error review. And the Court's failure to ensure that the defendant was tried before a fair and partial jury denied him a fair trial. Here's the evidence. Mr. Marsh gave a statement to the police which had denied taking place in the burglaries. The state's case primarily consisted of surveillance videos of the two burglarized businesses, Robertson's Vending and Arnold's Market, and the self-serving testimony of two witnesses, Kimberly Smith and Terrell White. As to the surveillance videos, the identities of these two individuals were suspect as their faces were obscured and the depictions were not clear. You'll see the videos, the very unclear depictions of the identities of the individuals. Even the owners of Robertson's Vending and Arnold's Market who had viewed the surveillance videos testified that these videos were not able to discernable to identify any identifiable faces. Thus, the surveillance videos did not amount to overwhelming evidence of guilt in this case. The other evidence against Mr. Marsh was the testimony of Kimberly Smith and Terrell White. However, because these witnesses were seriously flawed and lacked credibility, the evidence is still closely balanced despite their incriminating testimony. First, both of these witnesses were drug addicts who were involved in a three to four day crack cocaine binge at the time of the alleged robberies. And this is important bearing on their credibility because drug addicts should be viewed with suspicion because they are often notorious liars and have diminished ability to perceive and recall accurately. Second, both witnesses were less than credible because they had been facing criminal prosecutions themselves and likely cooperated with the prosecution with expectations of leniency. Smith was taken into custody on reward for failure to pay fines for a forgery conviction and testified that she cooperated with the police to avoid arrest, among other reasons. Further, she admitted that she had smoked crack cocaine with Mr. Marsh over a three The Terrell White was originally charged as a co-defendant with Mr. Marsh in the burglaries of the two businesses and testified as an accomplice. White ended up getting probation related to these charges. Mr. Marsh received two concurrent terms of 20 years in prison. Thus, considering the witnesses faced and avoided serious criminal liability, their credibility is suspect. Thus, despite this incriminating evidence, the evidence is still closely balanced for plain error review. Furthermore, the state, there was other evidence that suggested that the evidence was closely balanced. Mr. Marsh was not found in possession of any proceeds of the burglary. There was physical, there was no physical evidence that linked him to inside either of the two businesses. He did not admit to the crime. As a matter of fact, he denied it. And when a witness is, when it comes down to a witness's incriminating testimony against a defendant and a defendant denies it, that creates a question of closely balanced evidence for a plain error review. So I ask this Court to find that the trial court violated Rule 431B, did not comply with the rule. And secondly, that the evidence was sufficiently closely balanced to have plain error review of the issue. I ask Your Honors to reverse Mr. Marsh's conviction and demand for a new trial. Thank you, Counsel. Thank you. Argument for the State. Good afternoon, Your Honors. My name is Tess Schwartz, and I represent the State in this matter. May it please the Court, Counsel, the main issue of this case primarily revolves around the trial court's failure to properly admonish the Poor's Error Principle, which if you read the briefs, then you'll realize the State conceded that there was error in this case. This case does resemble that of People v. Mueller, which this Court decided not about a year ago with the same judge, Judge Schwartz. And the State does concede that there was error satisfying the first part of the first prong of plain error, which the defendant brings this claim under. However, the State would disagree that this claim would be successful because it disagrees with the defendant's claim of the evidence was closely balanced, as it was in People v. Mueller. The case at hand resembles, however, procedurally, leading up to the trial where the Court admonished the jury of the Poor's Error Principles. It did resemble People v. Mueller in that aspect. However, that's all it did, it resembled People v. Mueller. The evidence in this case is strikingly more apparent and more damning for the defendant than it was in People v. Mueller. In People v. Mueller, the Court found that the evidence was closely balanced because the State primarily focused on surveillance footage that was taken from J.C. Penney that they had a witness testify who was a loss prevention manager. She testified that she was heavily trained in how to focus and get a good picture of anyone in the store that she was suspicious of stealing merchandise. She testified that it was of good quality. She could tell the color of their eyes. She could tell features of their face. And at trial, whenever this video surveillance was presented, it showed that it was grainy. There was about 35 seconds of film, and there was no way to really identify who it was in the video and where this loss prevention manager said that's how she identified him. And she also testified that she was directly behind the defendant, going to the store, and so she was observing him. However, the surveillance footage showed that she was, in fact, over 20 feet away from the defendant. In that case, the Court also found error in the fact that the officer who arrested the defendant, he testified that he watched the video, and from the grainy, poor quality of the video, he recognized the defendant, and then later went and found the defendant and arrested him for that crime. So there was no direct physical evidence linking the defendant to the crime in People v. Muir, and they had really no way of explaining other than he claimed to have recognized him from the video footage, which no one could really tell who it was in the video footage. That is not at all the case here. The case here, there was plenty of physical evidence. One thing the State would like to note is that you may be wondering whether the trial court and the judge in specific in this case has learned this lesson about admonishing the jury, and the State would like to note that he didn't have the guidance of People v. Muir whenever this case occurred in trial court, and I'm sure Judge Schwartz has changed his ways. The State also does want to note that while I do agree with defense counsel in the manner in which he presented his error principles, it was error. He did still present the principles in his own fashion, we will say, but he did not ignore or leave out any principles, but we do still admit that under the requirements of 431, it was error. However, I would like to focus a little bit on the evidence, some of which defense counsel failed to mention. One of the things that defense counsel did mention in his opening argument was the physical evidence that was presented in this case. Most notably, the cell phone that was found at the launch of the defendant, literally in the doorway of Arnold's Market, which was the second business that was burglarized. Officer Dunning came and observed the scene and found a cell phone that was by the door of Arnold's Market, second burglary to occur, and picked it up, found the contact of the mom in the phone, which is pretty damning evidence, called it, and Phyllis Marsh answered and said, you know, that was her son's phone number. They also tested the phone and found his fingerprints and DNA on the cell phone matching it to the defendant, and that was a huge part of the evidence that was presented against the defendant. So, contrary to what the defense counsel claims, there was physical evidence tying and directly linking the defendant to the crime, unlike there was in People v. Mueller, where they had no way of saying how they came about finding the defendant other than recognizing him in a video. The defendant, whenever he was giving, whenever he gave his testimony, not his testimony, his statement to Officer Basil, he explained that his cell phone ended up there by an alternate theory where he said that two other white men came to the house of Kimbo Smith, where him, Mr. White, and Kimbo Smith had been smoking crack cocaine for about three to four days. They, these two other men, came over and borrowed his van in the middle of the night. That belonged to his girlfriend, Sylvia Simons, which had his cell phone in it. They went and burglarized Arnold's Market and, coincidentally, dropped his phone in front of the door. Kimbo Smith testified that she never saw two other men, or whatever, at her house over those three or four days. Mr. White testified that he never saw those two men. The defendant was not able to name them to Officer Basil when giving his statement. He's the only one, really, that claims having seen these two men at the house that took his van and dropped the cell phone. The other evidence that was found was a rubber mallet that was found and could be seen in the surveillance footage. They described it as a rubber mallet, which I was gathering, was some kind of tool that Kim Smith testified she got from a Halloween party. She testified that she gave it to the defendant whenever he asked if she had any tools. She gave him this rubber mallet and an Afro wig, which the accomplice, Mr. White, also testified to borrowing with the defendant. She testified that whenever they asked for tools, she gave him these, and that was used in the burglary of Arnold's Market, which was also found at Arnold's Market. The state would note, too, the fact that there was no DNA taken from the rubber mallet, but the video surveillance showed that the defendants wore gloves in this case, so there was no What I spoke of earlier, the video surveillance, while it didn't show at any point the defendant's full face, Kim Smith testified, you can see about from the nose down of the defendant at the Robertson vending burglary, and Kim Smith testified that she's known the defendant for over 20 years and she could recognize him and his goatee from the nose down. She testified to identifying him in that. The state notes that the owner of Robertson's vending and Arnold's Market, they were unable to identify the individuals in the video, but Kim Smith positively ID'd him in the video. The video surveillance also showed evidence and a picture of a white Dodge Caravan that was at Arnold's Market that the officers were able to locate, which belonged to the defendant's girlfriend, Sylvia Steinmetz. She testified that the defendant came and borrowed her van shortly before the first burglary and she loaned it to him for those couple of days. Kim Smith and Mr. White both testified that the defendant had this white van that was seen in the surveillance footage that was matched to the registration of Sylvia Steinmetz. There's no question about that there. Mrs. Steinmetz also testified that whenever she got the van back, the back seats were folded down in the back and there were glass shards in it. If you watch the surveillance footage in Arnold's Market, you can see that the two people in the video, the defendant and Mr. White, were trying to carry the ATM out of the window, but were unable to lift it into the van. The credibility issue in this case that the defendant claims Mrs. Smith and Mr. White are not credible, that was kind of the defendant's main theory and strategy of the case was to attack the credibility of these two witnesses. In addition to Mrs. Steinmetz testifying, Mrs. Smith and Mr. White were two of the main witnesses the state had in this case. Mr. White was an accomplice and he took an open plea in this case. And while the defendant claimed that both of these witnesses testified with expectations of leniency, both of these witnesses testified that they weren't expecting leniency. And in fact, Mr. White took an open plea. The state recommended that he get four years. However, the judge is the one who granted him probation. So clearly he had no expectation of leniency with the state because they're the ones that wanted to give him the four years, and the judge is the one who gave him the probation. The state has no knowledge and can't speculate as to why the judge gave him probation and didn't give him the four years. As your honors probably know, a number of factors go into sentencing. He was able to identify the defendant in the surveillance footage and himself as the one wearing the Afro wig at some points in the rubber mallet that was used. So he was able to positively ID both himself and the defendant in these surveillance videos. The defendant was able to impeach this witness, Mr. White, using Officer Basil. Officer Basil came in and testified to what Mr. White had previously told him. There were inconsistencies, as the defense stated in his testimony. And the state obviously isn't going to disagree with that. Your honors can read the record and see that there were inconsistencies. However, the jury was still able to assess this witness's credibility, and that's one of the jury's main obligations and main jobs is to assess the credibility of the witnesses. And that was their decision was to credit this witness and his testimony that he offered. The other witness, Ms. Smith, testified. And Ms. Smith, as the state notes, is an admitted addict. She testified to that. At the time of trial, she testified that she had not been an active user for about 11 months, but she was at the time of these burglaries. Your honor, if I can finish. Yes. Okay. Your honors, in this case, the state would simply like to ask this court to affirm the defense convictions for burglary and to refer to the brief for the state's second issue. And counsel, before you say that, let me ask you one question, and I'll pass this thing to Mr. O'Neill. On this second issue of credit for time served, you couldn't make it out, you couldn't reach any agreement? Your honors, much to my avail, I could not decipher the judge's handwriting in the docket. I tried, and it was unfortunately at the time where I contacted the department and the state's attorney, it was right at the time that there was a death in the jail in Jackson County. So it was going to be after I was filing my brief by the time they could get me that information. So I would just ask that they would remain. And I tried reading it, and I wasn't able to, and I wasn't able to piece together, even using what the defense cited to the record. I could not come to the same number, nor could I read the handwriting. So we would just ask that it would be remanded to the trial court and let the judge decipher his. Do you anticipate finding out some information? I can see if the state's attorney will get it from the chief officer. I will gladly try and get that information. But we would state that it's the defendant's burden if he would like to change his sentencing. Yeah, I agree with Justice Goldenherz. I would have no problem. If you want to do some further checking and even talk among yourselves, supplement the record. And the state, for all we know, we are incorrect, but I don't want to concede to something that I'm not able to speculate. So that would be fine if he's agreeable to that. We would be, I'm sure, more than able to come to some kind of solution. Great. Thank you, Your Honors. Thank you. Mr. O'Neill, on this issue, you came up with the 213 days. Yes, sir. Okay. So it's just a matter of them, the state, checking and see if they can agree with your calculation or not. I admit that the record is a little unclear, but the citations of the common law record that I made in my brief, I think that they are accurate. But, you know, I will work with counsel and see if we can come to an agreement. Okay, great. Regarding the cell phone that was found at Harlem's Market, first off, this does not connect Mr. Marsh at all to the robbery at Robertson's Venue. It has no connection to that. And secondly, Mr. Marsh did make a statement, as counsel referred to, explaining how he did not have possession of his cell phone for a while. And it suggested that these two other people who were at Smith's the night they were doing cocaine had taken his van and taken his cell phone. Now, I admit, this is not a sufficiency of evidence. I admit that there was evidence strong enough to convict beyond a reasonable doubt. Now, I cited several cases in my reply brief where the courts held that there was evidence to convict beyond a reasonable doubt. However, it is close, that evidence is closely balanced, is sufficiently closely balanced for plain error review. So this evidence that counsel has referred to, I mean, perhaps, I mean, it arguably could sustain a conviction beyond a reasonable doubt. But here, there's enough question in the evidence, in the weakness of the state's case, that the evidence is still closely balanced for plain error review. And when it comes down to a defendant's statement that contradicts a witness's statement, defendants denying that he was a part of all this, and then Smith and White saying that he was, I mean, lacking a lot of strong physical evidence involved in this case, too. That creates a conflict, a question that makes it closely balanced for purposes of plain error review. And with respect to White and Smith, again, their testimony was incriminating, I'll acknowledge that. But again, they're flawed and very weak, not credible witnesses sufficient to question their credibility and veracity for purposes of establishing closely balanced for plain error review, despite their incriminating testimony. And counsel mentioned that it was the job of the jury to judge the credibility of these witnesses. And that is true, and that's more appropriate for a sufficiency of the evidence standard, a sufficiency of the evidence claim. But here, the jury again could find the defendant guilty beyond a reasonable doubt. There's sufficient evidence for that. But still, the evidence is closely balanced for purposes of plain error review. So I ask your honors to find the evidence that's closely balanced for plain error review in regards to this conviction. Counsel, did the record indicate how long the jury deliberated? I don't recall that being argued by either side. Your honor, I don't recall. Thank you. Thank you. The court will take this case under advisement and issue a written ruling. Court will be in recess.